## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
**Civil Division**

_____

JULIE BECK,

               Plaintiff,                       CIVIL ACTION NO:

      vs.                                    JURY DEMANDED

WYETH, INC.; and
WYETH PHARMACEUTICALS INC.;

               Defendants.

_____

### COMPLAINT

NOW COMES the Plaintiff, Julie Beck by and through her attorneys, and sues the Defendants, Wyeth, Inc. and Wyeth Pharmaceuticals Inc., the manufacturers of menopausal hormone replacement therapy, and for her cause of action, alleges and avers as follows:

### PREAMBLE

Since the first estrogen pill was introduced in 1942, makers of synthetic sex hormones have created a marketing and cultural phenomenon. Drug companies' claims to support the use of menopausal hormone therapy were never backed by reliable scientific evidence, despite a flood of drug-company promotions.

In July, 2002, federal officials abruptly stopped a tax-payer funded trial of hormone therapy drugs that was being conducted by the Women's Health Initiative (WHI). The WHI trial revealed that women taking Prempro, a combination of estrogen and progestin hormones, were at

an increased risk of breast cancer, heart disease and stroke. The *New England Journal of Medicine* concluded in February, 2003, that the "risks of breast cancer, venous thrombo-embolism, and stroke are too high a price to pay" for unsubstantiated benefit of hormone therapy.

Virtually all studies following the WHI demonstrate conclusively that evidence-based medicine took a back seat to "conventional wisdom." The *New England Journal of Medicine* wrote in October, 2003:

> The simple and intuitively appealing concept that replacing estrogen lost during menopause would be beneficial was easy for both patients and physicians to believe. . . . *As a result, many people suspended ordinary standards of evidence* concerning medical interventions . . . despite the absence of any large scale clinical trial quantifying their overall risk-benefit ratio.

[Emphasis added].

The publication of the WHI findings on July 9, 2002 was a watershed moment in the history of hormone therapy. At once, the previously unknown or controversial long-term risks of menopausal hormone therapy became apparent. This revelation forever changed the risk benefit profile of these drugs. Armed with this new information, women and physicians alike acted upon it. Substantial numbers of women who were then taking hormone therapy stopped it abruptly. Those considering starting hormone therapy declined to do so. At the same time, physicians' discussions with patients changed in that the purported benefit of hormone therapy, such as the prevention of cardiovascular disease, prevention of macular degeneration, and prevention of Alzheimer's disease, among others, were no longer discussed. Furthermore, new emphasis was placed on the risks of hormone therapy, including the risk of breast cancer. Hormone therapy fell out of favor for long-term use in menopausal women. Simply, physicians stopped prescribing combination hormone therapy in favor of safer alternatives.

As a result of fewer women being exposed to hormone therapy, fewer women have been diagnosed with breast cancer. In the *Journal of the National Cancer Institute*, leading scientists wrote that "the impact of declining use of hormone therapy could account for an estimated 17,500 fewer ER-positive invasive breast cancer cases <u>annually</u> among women aged 50-69 years." (*Kerlikowske*, *JNCI*. 2007; 99:1-5). Even more staggering, is the conclusion that hormone therapy could be the cause of more than 127,000 breast cancer diagnoses. (*Clark*, *Cancer Causes Control,* 2007 Jul 6; [Epub ahead of print]). Dr. Graham Colditz, arguably the world's leading breast cancer epidemiologist, recently summarized the current state of knowledge by stating unequivocally: "Combination estrogen plus progestin causes breast cancer." (*Breast Cancer Research* 2007, 9:108). That conclusion, recognized by virtually all reputable scientists world wide, is denied only by the Defendants.

The Plaintiff in this lawsuit will prove that these hormone therapy drugs were unreasonably dangerous for any long term use, and that the Defendants promoted synthetic hormone drug therapy without conducting appropriate long-term clinical trials to support their claims. The Plaintiff will further prove that Defendants pushed hormone therapy drugs onto the medical community, without sufficient warnings. Had Defendants acted appropriately, tens of thousands of women nationwide, and the Plaintiff herein, would not have developed breast cancer.

# I. <u>INTRODUCTION</u>

1.      Defendants Wyeth, Inc. and Wyeth Pharmaceuticals Inc. (hereinafter "Wyeth") tested, manufactured, marketed, distributed, promoted, and sold Premarin, Prempro, Premphase and medroxyprogesterone acetate (synthetic progestin). Premarin, Prempro, and Premphase are hormone replacement drugs prescribed for post-menopausal women to treat some of the

problems often associated with menopause, such as hot flashes, night sweats, sleeplessness, and vaginal dryness. Medroxyprogesterone acetate (MPA) is the synthetic progestin used in Prempro and Premphase.

2.      Premarin is referred to as "estrogen only," "estrogen replacement," or "unopposed estrogen" hormone therapy because Premarin pills contain only estrogen.

3.      Prempro, Premphase, and Premarin plus Provera or MPA are referred to as "combination" hormone therapy because progestin is added to the estrogen. Prempro combines the two hormones, estrogen and progestin, in a single tablet that is taken daily, while Premphase adds progestin to the daily dosage of estrogen only during the last two weeks of the menstrual cycle. Premarin plus Provera or MPA are two pills taken either continuously or cyclically.

4.      At all times relevant, Defendants were acting by and through their agents, servants, and/or employees, who were acting within the course and scope of their employment or agency or authority.

5.      For decades, Wyeth has vigorously promoted the hormone replacement therapy it marketed as safe, efficacious and beneficial to women.

6.      However, on July 9, 2002, the National Heart, Lung and Blood Institute ("NHLBI"), a division of the National Institutes of Health ("NIH"), prematurely halted the 16,600-patient Women's Health Initiative (WHI study) clinical trial designed to evaluate the risks and benefit of Prempro hormone therapy in healthy post-menopausal women after WHI researchers determined the risks of taking Wyeth's Prempro outweighed the benefits.

7.      Almost simultaneously, researchers at the National Cancer Institute ("NCI") reported that women who used long-term estrogen therapy (e.g., Wyeth's Premarin) are at a significantly increased risk of developing ovarian cancer.

8.     Taken together, the two studies established that long-term use of Wyeth's combination hormone therapy pill, Prempro, increased the risk of cardiovascular disease, invasive breast cancer, pulmonary embolism, blood clots, stroke, heart attack and ovarian cancer. The information gleaned from these and subsequent studies was knowable to the Defendants had they bothered to investigate and look.  Had the Defendants conducted the appropriate studies at the appropriate times, having been on notice of the potential increased risk of hormone induced breast cancer since at least the mid-1970's, the Plaintiff would have been adequately warned, would not have taken the Defendants' hormone therapy drugs, and would not have developed breast cancer.

9.     Defendants knew, or should have known, the serious risks their hormone therapy drugs posed to women. The Defendants' decades-long marketing and promotion of hormone therapy - either as combination estrogen and progestin therapy (e.g., Prempro, Premphase, or Premarin plus Provera / MPA) or estrogen alone (e.g., Premarin), as safe and beneficial to post-menopausal women was false and misleading.

## II.  PARTIES, JURISDICTION AND VENUE

10.     Plaintiff, Julie Beck, was at all times relevant hereto, a citizen of the United States and resident of Westlake Village, California.

11.     Defendant Wyeth, Inc., is a Delaware corporation headquartered and with a principal place of business at 5 Giralda Farms, Madison, New Jersey.  At all times relevant hereto, Wyeth, Inc., was engaged in the testing, manufacturing, labeling, marketing, distribution, promotion, and sale of hormone therapy drugs, including Premarin and Prempro in Minnesota.

12.     Defendant Wyeth Pharmaceuticals Inc. is a New York corporation with a principal place of business at 500 Arcola Drive, Collegeville, Pennsylvania.  At all times relevant

hereto, Wyeth Pharmaceuticals Inc., was engaged in the testing, manufacturing, labeling, marketing, distribution, promotion, and sale of hormone therapy drugs, including Premarin and Prempro in Minnesota.

13.    Personal jurisdiction is appropriate in this court as Defendants have done business throughout Minnesota, either directly or by an agent, they have continuing minimum contacts with Minnesota, and have thus availed themselves of this jurisdiction.

14.    Venue is proper in this District pursuant to 28 U.S.C. §1391.  Defendants have advertised in this District, received substantial compensation and profit from the sales of their hormone therapy drugs in this District, and have made material omissions and misrepresentations and breached warranties in this District.

15.    This court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and this is an action by an individual Plaintiff who is a citizen of a different state from that of Defendants.

### III.  FACTUAL BACKGROUND

#### A.    Case Specific Facts

16.    On or about January 5, 2002, Plaintiff, Julie Beck, was diagnosed with breast cancer.

17.    Prior to her breast cancer diagnosis, Plaintiff ingested Premphase and Prempro, which were prescribed by her treating physician.

18.    During her course of treatment with combination hormone therapy, Plaintiff continued to undergo routine GYN check-ups and yearly mammograms.

19.    Subsequent to her cancer diagnosis, Plaintiff underwent painful and persistent treatment for this condition.

20.    Plaintiff lives in constant fear of the breast cancer progressing and/or recurring.

21.    The Plaintiff was at low risk for developing breast cancer prior to her use of the combination hormone therapy.

22.    Combination hormone therapy fuels the promotion of hormone receptive positive, abnormal pre-cancerous cells to develop into invasive carcinomas, and did so in this case.

23.    As a direct result of being prescribed and taking Premphase and Prempro, Plaintiff was diagnosed with breast cancer, which she would not have developed had she not taken combination hormone therapy.

24.    As a further direct and proximate cause of her use of combination hormone therapy, Plaintiff underwent painful and debilitating treatment for her cancer.  She has and will continue to endure untold pain and physical disfigurement, suffering, mental anguish, embarrassment, fear of recurrence, loss of confidence, health care expenses and hospitalization, loss of wages and economic benefit, a shortened life expectancy, and other damages.

   **B.    The Marketing and Regulatory History of Premarin and Prempro**

25.    Menopause is the cessation of menstruation caused by declining levels of estrogen and progesterone.  It is a natural human phenomenon-- a phase of the female reproductive aging process-- and is not a disease.  Symptoms, which vary in severity from woman to woman, may include hot flashes, chills, vaginal dryness, headache and irritability.  Adverse consequences of the drop in estrogen levels which begin with menopause and continue after menopause include, *inter alia*, vaginal atrophy and dryness; an increase in LDL cholesterol levels; and, a decrease in bone density with resultant increased risk of osteoporosis.

26.     These symptoms and consequences of menopause have been described in scientific literature since the late 1800s, and by the turn of the 20th century, the search for an aid to alleviate them was widely pursued.

27.     In 1942, Ayerst, the predecessor to Wyeth, received patent and approval of the United States Food and Drug Administration ("FDA") for Premarin, a mixture of estrogens extracted from the urine of pregnant mares.  Premarin was marketed to women and their physicians as the long sought after replacement for lost estrogen in menopausal women, and was referred to as "Replacement" estrogen therapy.

28.     The FDA originally approved Premarin only to relieve menopausal symptoms, such as hot flashes and vaginal atrophy.  Wyeth, however, has long touted additional benefit for Premarin, and their subsequently marketed hormone therapy drugs, Prempro, Premphase and medroxyprogesterone acetate.

29.     In the 1960's, Wyeth's Premarin promotional materials utilized articles and books written Dr. Robert Wilson, New York gynecologist, who recommended uses of Premarin far beyond those approved by the FDA.  In a 1962 article that appeared in the *Journal of the American Medical Association* (*JAMA*), Dr. Wilson claimed taking estrogen during menopause *reduced* breast and genital cancers.  In his 1966 bestselling book entitled *Feminine Forever*—that Wyeth's sales forces distributed to physicians throughout the country--Dr. Wilson wrote that "aside from keeping a woman sexually attractive and potent . . . estrogen preserves the strength of her bones, the glow of her skin, the gloss of her hair . . . Estrogen makes women adaptable, even-tempered, and generally easy to live with."  In the book, Dr. Wilson again asserted that estrogen prevented cancers.

30.    Following Dr. Wilson's publications, sales of Premarin quadrupled.  As reported in The Greatest Experiment Ever Performed on Women by Barbara Seaman, Wyeth poured thousands of dollars into Dr. Wilson's research.  By the mid-70s, more than 30 million prescriptions for Premarin were being written every year, eventually making it the fifth most frequently prescribed drug in the United States.

31.    Physicians were instructed in advertisements to prescribe Premarin to achieve "tranquilizing" effects for their female patients-- as if that effect was a laudable goal:  "Almost any tranquilizer might calm her down . . . but at her age, estrogen may be what she really needs" claimed one advertisement.

32.    The promotional advertising downplayed the risks of hormone therapy and over promoted the benefit.  A 1970's article in Harper's Bazaar claimed:  "There doesn't seem to be a sexy thing estrogen can't and won't do to keep you flirtatiously feminine for the rest of your days . . .a real package deal that spruces up your vagina . . . Prevalent medical opinion is that the safety and benefit of ERT have been convincingly demonstrated."

33.    By the mid-1970's, more than 30 million prescriptions for Premarin were being written every year, later making it the fifth most frequently prescribed drug in the United States.

34.    But the "safety and benefit" of Premarin were cast in serious doubt following scientific reports evidencing a causal relationship between estrogen and endometrial cancer. Sales plummeted, and physicians stopped prescribing Premarin except to those women who had hysterectomies and thus were not at risk for endometrial cancer.

35.    In December of 1975, Wyeth issued a dear doctor letter concerning the endometrial cancer crisis.  In that letter, Wyeth misrepresented the data to physicians and claimed that there was no real evidence that estrogen was causing the crisis.  In January of 1976,

the FDA held a meeting with Wyeth at which the FDA expressed their belief that Wyeth's dear doctor letter had been a "misrepresentation of the scientific data," was warped in tone, was intended to obfuscate the issues rather than provide risk data to the physicians and was a borderline violation of the FDA's laws and regulations.

36.    Faced with the endometrial cancer problem, some scientists theorized that by adding a progestin to estrogen, women would receive the benefit of estrogen therapy, but would receive the added benefit of uterine protection provided by the progestin.  Defendants thus produced and marketed progestin (i.e., synthetic progesterone or medroxyprogesterone acetate) as an adjunct to Premarin estrogen hormone therapy to protect against the risk of endometrial cancer.

37.    By the mid 1970's, Wyeth knew that many practicing gynecologists were introducing progestins into their estrogen therapy for menopausal women.  But as Wyeth recognized, the number of published, well-designed studies was small or practically non-existent. Yet, rather than immediately design, implement and sponsor studies looking at the safety of this combination modality, Wyeth chose to do nothing.

38.    In the late 1970s, sales of Premarin began to recover from the endometrial cancer epidemic, due to the sudden change in physicians' prescribing habits to combine estrogen and MPA for hormone therapy.  Wyeth hoped to capture the market for both Premarin and the necessary progestin component.

**C.  Wyeth Repeatedly Chooses to Ignore the Warning Signs and Chose Not to Study The Safety Profile of Combination Hormone Therapy.**

39.    Even before the endometrial cancer crisis, Wyeth understood the reported link between estrogens and breast cancer.  Indeed, Wyeth recognized as early as 1976, if not before, that estrogens maintain the growth of pre-existing and metastatic lesions, but that the role of

hormones in the etiology of breast cancer needed to be clarified.  Thus, while Wyeth knew their drug was a carcinogen of the uterus, it recognized the possibility that the breasts – also estrogen sensitive organs – also were at risk.

40.    Subsequent medical literature put the Defendants on notice that hormone receptor positive breast cancers were on the rise in this country, that such rise occurred in postmenopausal women and that this data implicated hormone drug use in the increase in cancers.  This data put the Defendants on notice that studies were needed on hormone receptor positive breast cancers and the link to hormone therapy drugs

41.    By 1983, Wyeth-Ayerst was fully aware of the lack of data supporting the purported benefit of hormone therapy.  Attending an Estrogens Workshop sponsored by the National Heart Lung and Blood Institute of the National Institutes of Health on September 13-14, 1983, Wyeth executives learned that leadings scientists were advocating that a relatively large, long-term, randomized clinical trial study on the effects of estrogens on morbidity and mortality.  Thus, Wyeth was on notice of the need for such a study, and the feasibility of doing one.  In response, Wyeth chose to do nothing.

42.    In 1983, Wyeth submitted a supplemental drug application for a combination hormone therapy package called PREM-PAK, a product containing Premarin and a progestin for cyclical use.  The application was a "paper-NDA" (New Drug Application) which relied on existing studies, rather than Wyeth having done new, real studies to get the answers to the safety questions posed.  In fact, choosing to ignore their duty to test for the dangers of the combination product, because the results may have turned out to be "embarrassing." Accordingly, Wyeth chose to do nothing.

43.    The Defendants knew for decades that conjugated estrogen caused endometrial cancer by stimulating estrogen-sensitive tissues in the uterus.  Defendant Wyeth also questioned whether Premarin, alone or combined with MPA, could also promote the development of tumors in the breast, another hormone-sensitive reproductive organ.  Based on the lessons learned from the endometrial cancer epidemic, Defendant Wyeth knew or should have known that the fastest and least expensive way to look for such signals was to monitor the breast cancer registries in areas where combination hormone therapy use was the highest.  Wyeth knew also that the most efficient means to investigate and measure any association between the new combination hormone therapy regimen and hormone dependent breast cancer  was with case control studies in geographic regions where combination hormone therapy first became most popular.   However, Defendant Wyeth did no investigation at all to look for potential breast cancer side effects of hormone therapy.  Instead – Wyeth devoted their money and resources to increasing sales and expanding the market for their hormone therapy drugs.

44.    As a result of the endometrial cancer epidemic, and because physicians were adding MPA to Premarin for treatment of menopause, Pfizer was able to position their drug Provera as a necessary component in hormone therapy treatment even though Provera was not approved for the treatment of menopause.  Pfizer developed MPA under the brand name Provera in 1959.  It was approved only for secondary amenorrhea, functional uterine bleeding, infertility and related conditions due to hormone imbalance in the absence of organic pathology.  MPA is a synthetic progestin.  MPA is not the same as the progesterone that a woman's body produces naturally.  Because it is not bio-identical, MPA has different actions in the body than natural progesterone, which is not patentable.   In fact, MPA is far more potent than progesterone, and it produces substantially more serious side effects.   Defendant Wyeth knew that MPA had effects

on cells not seen with progesterone, such as effects on androgen and other receptors present in breast tissue, but neither company did any animal or human studies to assess whether MPA could increase the risk of breast cancer.

45.    Defendants (and later generic MPA manufacturers) knew that Provera (and subsequent generic MPAs) did not have the same benefit as progesterone, but potentially had greater risks. Defendant Wyeth was aware that there was no evidence of long-term safety of estrogen combined with MPA for the treatment of menopause. Neither Pfizer nor Wyeth had monitored the cancer databases to look for signals that Premarin and Provera or MPA might be causing an increase in the incidence of breast cancers in older women who were the target market of hormone therapy. Neither company conducted or helped to fund any case control or cohort studies designed to assess the risks of breast cancer or blood clots with the new oral combination regimen, from which both companies profited.

46.    The endometrial cancer crisis caused by Premarin should have motivated the Defendants to conduct studies to find out whether adding synthetic progestins to estrogen could also promote estrogen receptor positive cancers in hormone-sensitive breast tissue. This is especially true because the Defendants had notice from the medical literature that progestins when combined with estrogen could cause breast cancer. As responsible pharmaceutical companies, Defendants had a duty to perform and support studies that examined the known and potential risks, as well as benefits, of hormone therapy. Had the Defendants monitored large breast cancer registry databases for changes in hormone-dependent breast cancers in postmenopausal women, it would have seen a suspicious increase in these cancer subtypes by the late 1980s.

47.    In 1985, Defendant Wyeth put a new spin on the marketing of hormone therapy drugs by claiming that it could help prevent bone loss.  Defendant Wyeth hired a public relations firm to create public awareness of osteoporosis.  After Defendant Wyeth learned that 77 percent of women had never heard of osteoporosis, the company launched a large-scale, public relations campaign to persuade women that osteoporosis is a devastating disease that could be prevented with Defendant Wyeth's drug, Premarin.

48.    Defendant Wyeth's public relations campaign created support for a National Osteoporosis Week and eventually for a National Osteoporosis Foundation (to which Defendant Wyeth financially contributed).

49.    The Defendants represented to doctors, patients and the public that estrogen and combination hormone therapy drugs could prevent or reduce cardiovascular disease.  The Defendants' sales representatives encouraged doctors to prescribe hormone therapy even if a woman was not having menopausal symptoms because of the therapy's purported cardiac benefit.  In fact, reliable scientific evidence has never supported these supposed benefits.  Nevertheless, the Defendants recommended that physicians prescribe these hormone drugs in order to provide patients with purported cardiac protection.

50.    As a result of Defendant Wyeth's marketing efforts, between 1990 and 1995, Premarin became the most frequently dispensed prescription drug in the United States.  The Defendant saw a dramatic increase in sales and profits.  Increased sales arose from marketing efforts aimed at promoting combination use of hormone therapy drugs without ever adequately warning of the risks.

51.    By 1986, the Defendants knew from the published literature that physicians were calling for more studies.  Indeed, such articles noted that there were "no studies of adequate

design, duration and sample size to determine the risks and benefits of any prolonged estrogen – progestin combination".

52.    In 1989, the first published article concerning combination hormone therapy showed a relative risk of 4.4 for breast cancer in combination users.  The Defendants never included this information in the warnings or labels for either estrogen, progestin or combination hormone therapy.

53.    Indeed, several different physicians and research groups approached Wyeth in the 1980s and 1990s and offered to conduct various types of studies in order to help answer the breast cancer issue.  Wyeth refused to fund any of those proposals.  Indeed, Wyeth noted as to one request that the company would not support the suggested study because this Defendant had a "company policy" against funding such studies.

54.    In 1990 and 1991, The Fertility and Maternal Health Drugs Advisory Committee of the FDA held meetings to discuss menopausal hormone therapy, and specifically, breast and endometrial cancer associated with HRT.  The FDA was asked to address several questions, including:  "Does the addition of progestins to estrogen therapy alter the risk of breast cancer in postmenopausal women?"  And the FDA responded:  "The Committee responds unanimously that there are insufficient data to answer these questions at this time."  The Committee continued that there was insufficient data concerning the effect t of added progestins on the possible risk of breast cancer with estrogens."  Thus, since the late 1970's, combination hormone therapy was being used by physicians.  Over a decade later, the FDA recognizes that there is no data to answer the safety question.  Content to take the benefit of the profit, but ignore the responsibility of the testing, sales continued and women continued to be at risk and develop breast cancer.

55.     All this time, Wyeth published a magazine called *Seasons,* a journal designed for menopausal women and sent to them for free.   *Seasons* had a subscription of more than 1,400,000 women in 1996.  Rather than take this database of women and do a study to evaluate these women and their health histories, Wyeth chose to do nothing with these women but send them a magazine to reinforce the message that they stay on their hormone therapy.

56.     Premarin's huge success was bolstered by claims that indefinite, long term use of estrogen therapy was safe and efficacious.  In an early 1990's promotional videotape distributed directly to consumers entitled "What every woman should know about estrogen," Wyeth represented to women that estrogen provided "long term health protection" and should be continued indefinitely, even after short-term menopausal symptoms, such as hot flashes, had subsided.  When a purported consumer inquired how long Premarin should be taken, Wyeth's doctor-spokesperson responded "anywhere from five to ten years in order to get protection from long term problems."  And, with regard to breast cancer risks, Wyeth represented to women that the benefit of taking estrogen "far outweigh[ed]" the risks for women unless they faced a particularly high risk of breast cancer.

57.     The Defendants have consistently downplayed studies that identified specific risks of hormone therapy.  For example, in 1996, European scientists and researchers found that women with vertebral fractures had a 4.6 times increased risk of developing breast cancer if they took combination hormone therapy.  These scientists believed that the risk of breast cancer associated with hormone replacement therapy had been substantially underestimated because osteoporosis is a primary indication for their use.  In particular, Defendant Wyeth implemented a "dismissive strategy" to "dismiss and distract" the U.S. press from covering these findings and made concerted efforts to keep the study results isolated in Europe.  The Defendant Wyeth never

informed physicians about this dramatically increased risk for patients with bone mass density problems, fractures or osteoporosis. Instead, the Defendant Wyeth promoted hormone therapy as something that could prevent osteoporosis and encouraged doctors to prescribe the drugs to these high risk patients

58.     Prior to 1995, Wyeth began to develop a combination therapy pill that would combine Premarin with progestin. This product development was necessary because Wyeth was faced with the threat of a shrinking market for Premarin at the end of their patent protection in 1995.

59.     In 1995, Wyeth introduced Prempro and Premphase, "combination" hormone therapies that contained estrogen and medroxyprogesterone acetate (synthetic progestin). Prempro combines the estrogenic compound CEE (conjugated equine estrogen made from horse urine) with the progestin MPA in a single pill taken once daily.

60.     The Medical Officer's Review of the Prempro NDA summarized the available clinical data to date and aptly concluded that recently reported studies suggest that the addition of progestins to estrogen may <u>exacerbate</u> the risk of breast cancer. Officer Linda Golden wrote:

> Breast cancer is a major public health problem in the United States; the average American woman currently faces an approximately 1 in 10 total lifetime risk of developing breast cancer, with the vast majority of cases occurring after menopause. Thus, in the postmenopausal population, **even small increments in the relative risk of breast cancer have great public health significance.** Because of the long latency between exposure to promotional agents and detection of clinical tumors, however, prospective studies take many years to conduct and require extremely large sample sizes to ensure statistically meaningful treatment group comparisons. Since many more years are still needed before the relationship between HRT and breast cancer can be definitely determined, **the public health impact of this safety concern increases with the growing popularity of HRT usage by a rapidly expanding population of perimenopausal "baby boom" women. As such, the true effect of HRT on breast**

cancer incidence and mortality must be considered the single
most important safety issue concerning this class of drugs.

.

61.    As a condition of Prempro's approval, the FDA told Defendant Wyeth to conduct follow-up case-control studies to quantify more precisely the risk of breast cancer for combination hormone therapy.  The FDA was concerned about the lack of long-term studies on combination hormone therapy and breast cancer.  In particular, the FDA worried that even a small increased risk in breast cancer may have serious public health implications because of the large number of women using hormone therapy

62.    Wyeth led physicians and their menopausal patients to believe the promotional claims it made regarding Premarin.  When Wyeth introduced Prempro into the market, Wyeth sought to have physicians and women believe that the same claims existed for these hormone therapies as Wyeth had claimed about Premarin.

63.    Wyeth over-promoted Prempro just as it did Premarin.  For example, Wyeth distributed a brochure that asked women to "Take a few minutes to think about the rest of your life," and then listed medical conditions to "think about," which neither Prempro nor Premarin had been approved by the FDA to treat, including Alzheimer's disease, vision problems, tooth loss, heart disease, and colon cancer.

64.    Soon after the introduction of Prempro, Defendant Wyeth agreed to fund a four-year heart disease prevention trial called "HERS: Heart and Estrogen/Progestin Replacement Study."  Defendant Wyeth touted the study as one that would show that Prempro prevents heart disease in women who are at high risk.  At the time, Defendant Wyeth sought  FDA approval of Prempro to prevent or reduce the risk of heart disease. But in 1998, the HERS investigators reported that hormone therapy did not reduce the rate of coronary heart disease events in women

with heart disease. In fact, the study demonstrated that hormone therapy increases the risk of heart disease and heart attacks in this population of women, especially during the first year. Defendant Wyeth and their sales representatives responded by minimizing or ignoring the HERS results.

65.     Wyeth has vigorously promoted hormone therapy to physicians, as well as to consumers directly.  In 1999, Wyeth spent $34.7 million on DTC advertising for Prempro.  In 2000, Wyeth spent $37.4 million on Prempro DTC advertising.  The thrust of Wyeth's marketing efforts has been to create a lifelong consumer demand for hormone therapy, and a belief by physicians that the prescription is beneficial to menopausal and post-menopausal patients.

66.     In a magazine advertisement featuring model Lauren Hutton, Wyeth made a rash of similar claims, suggesting that their hormone therapy drugs were appropriate for treating or preventing, among other things, memory loss, colon cancer, and age-related vision loss.  In the March 19, 2000, edition of *Parade Magazine,* Wyeth spokesperson Lauren Hutton (who was not identified as a Wyeth spokesperson) was asked what she did to look good and feel fit, and she answered:  "[M]y number one secret is estrogen.  It's good for your moods; it's good for your skin.  If I had to choose between all my creams and makeup for feeling and looking good, I'd take the estrogen.

67.     Wyeth's DTC (i.e., "direct-to-consumer" or "DTC" marketing) efforts have included overt advertising pieces, such as print advertisements, videotapes, and brochures directed to consumers, as well as "product placement" efforts in which hormone therapy drugs are favorably positioned in entertainment vehicles or favorably described in the popular press by hired spokespersons.

68.    By the late 1990s and early in 2000, the Defendants knew or should have known about studies showing a significantly increased risk of breast cancer for women using combination hormone therapy.  Indeed, these studies showed that hormone therapy was associated with a greater than four-fold increased risk of breast cancer.  Despite this knowledge, Defendants minimized the risk by all available means by assuring doctors that the risk was modest at most, with some studies showing no risk.  The Defendants' representations were false and misleading and were intended to downplay the cancer risks associated with hormone therapy.

69.    A cornerstone of Defendant Wyeth's marketing program was the promotion of hormone therapy for long-term use of indefinite duration.  Specifically, JAMA reported that:  In 2000, 46 million prescriptions were written for Premarin (conjugated estrogens), making it the second most frequently prescribed medication in the United States and accounting for more that $1 billion in sales, and 22.3 million prescriptions were written for Prempro (conjugated estrogens plus medroxyprogesterone acetate).  While FDA approved indications for hormone therapy include relief of menopausal symptoms and prevention of osteoporosis, long-term use has been in vogue to prevent a range of chronic conditions, especially heart disease (emphasis added).

70.    Wyeth persistently pressed the FDA to approve the use of Prempro to prevent or reduce the progression of heart disease in post-menopausal women.  The FDA denied Defendant Wyeth's request because the agency did not believe there was sufficient scientific evidence to support such an indication/use of the drug, given the absence of reliable science from a controlled study to support Defendant Wyeth's assertions.  Even though the FDA refused to approve the use of Prempro to prevent development of heart disease, Defendant Wyeth continued to promote Prempro for cardiovascular disease prevention and even represented to physicians

that Prempro reduced cardiovascular mortality by 50 percent. Such promotion was off-label and against FDA regulation.

71.    The Defendants knew that there were subgroup populations of users who were at an increased risk of developing breast cancer from their exposure to hormone therapy. Yet the Defendants never provided such warnings to the physicians or public. The lack of such information made the warnings and labels that accompanied combination hormone therapy insufficient and inappropriate.

72.    To deliver the Defendants' marketing message to patients and doctors about their hormone therapy drugs, the Defendants have used some or all of the following marketing methods:

    a.      Sponsoring medical journal articles;

    b.      "Ghost writing" medical journal articles

    c.      Having detailing/sales representatives call on physicians;

    e.      Sponsoring continuing medical education programs;

    f.      Hiring doctors to speak to other doctors one on one or in small group meetings;

    g.      Issuing press releases;

    h.      Advertising directly to consumers;

    i.      Advertising to physicians in medical journals and materials; and

    j.      Sponsoring medical and pseudo-medical organizations to make statements.

73.    Ultimately, Defendant Wyeth's decade-long marketing strategy succeeded in skewing perceptions about the risk/benefit profile of hormone therapy. Defendant Wyeth's own marketing research studies boasted that during the 1980s, the medical community and women believed that the risk of breast cancer outweighed hormone therapy's sole benefit of relieving hot

flashes.  Thanks to Wyeth's unlawful marketing efforts, by the late 1990s, the "paradigm" had "shifted" so that doctors and patients believed that the breast cancer risk was minimal and far outweighed by a "bundle of benefit" including prevention of: vasomotor symptoms, osteoporosis, cardiovascular disease, central nervous system disease, Alzheimer's disease, colon cancer, macular degeneration, and osteoarthritis.  Most of these supposed benefit had little or no scientific support.

### D.    The Women's Health Initiative and Other Significant Scientific Studies

74.    In the early 1990s, the Women's Health Initiative ("WHI") Study began. Conducted by the National Institutes of Health (NIH) and funded by tax-payer dollars, two randomized arms of this study were undertaken to confirm Prempro's and Premarin's heart, osteoporosis and mental cognition benefit.  The parts of the WHI study that Wyeth supported were neither designed nor adequately powered to assess risks of rare conditions such as breast cancer.  Like all randomized controlled trials, the Prempro and Premarin arms of the WHI study were designed to investigate Prempro's benefit.  Rather than doing the case-control studies requested by the FDA to determine the degree of breast cancer risk caused by Prempro, Defendant Wyeth convinced the FDA that a single observational arm of the WHI study was adequate to address the agency's concerns about breast cancer risk.  In fact, to this day, Defendant Wyeth has never performed or supported any observational study adequately designed to assess breast cancer risk with combination hormone therapy, including Prempro. The FDA had no legal authority to enforce Wyeth's promise to conduct post-marketing observational studies on Prempro.

75.    On July 9, 2002, the National Heart, Lung and Blood Institute ("NHLBI"), a federal agency and part of the National Institutes of Health ("NIH"), halted the Prempro

randomized arm of the WHI study because the investigators concluded that, under the circumstances, the risks of taking Prempro outweighed their benefit.  Subsequently, the NHLBI also halted the Premarin randomized arm of the study because it found that the risks of Premarin also outweighed the benefit.

76.    Independent researchers also conducted a series of epidemiological studies specifically designed to investigate the risks of hormone therapy.  At least two dozen studies found that combination hormone therapy increases the risk of breast cancer by more than two-fold, and the risk continues to rise with longer durations of use.   These studies more precisely quantified the risk of breast cancer shown initially in the WHI study.

77.    In addition, several more recent ecological studies published in 2006 and 2007 confirmed that hormone therapy caused a new epidemic of hormone-induced tumors – this time, breast cancer.  The studies compared new data from breast cancer registries and hormone therapy prescriptions.  The studies each analyzed different registries.  All of the studies found that the incidence of hormone-receptor positive breast cancer in postmenopausal women increased steadily during the 1980s and 1990s.  Beginning in 1999, the rise in this type of breast cancer leveled off and began to drop slightly as a result of the published HERS results.  After July of 2002, the slowly declining rates suddenly dropped precipitously, when the results of the WHI Prempro experiment became public.  The rise and fall of these hormone-sensitive breast cancers in postmenopausal women corresponded to a matching rise and fall in hormone therapy prescriptions.  The authors of these studies all concluded that this dramatic and unprecedented decrease in a specific cancer subtype in postmenopausal women – the target of the hormone therapy market – was most likely due to use of hormone therapy.  They also agreed that the evidence supported a cause-and effect relationship between hormone therapy and breast cancer.

This pattern observed with estrogen/MPA is identical to the rise and fall of endometrial cancers and Premarin prescriptions seen in the 1970s with the estrogen-induced endometrial cancer epidemic.

      E.        **The Aftermath of the WHI and NCI Studies**

      78.     The WHI and NCI study conclusions regarding the unsafe and dangerous adverse effects of hormone therapy have been verified by subsequent published research.

      79.     On October 23, 2002, the United Kingdom's Medical Research Council announced that it had ended a clinical study of the risks and benefit of long-term use of hormone therapy for "scientific and practical reasons." In the "WISDOM" study (the Women's International Study of Long Duration Oestrogen after Menopause), 5,700 women were enrolled. The study was to include 22,000 women. However, following the WHI study, the WISDOM study was canceled. The Medical Research Council concluded, "There is strong evidence that taking hormone therapy long term increases the risks of some diseases such as breast cancer and decreases the risks of others such as osteoporosis."

      80.     Because of the significance of their findings, on March 17, 2003, the New England Journal of Medicine (NEJM) released a follow-up WHI study two-months in advance of their May 8th publication date. The follow-up study reported that hormone therapy failed to improve the quality of life for menopausal women.

81.    The Quality of Life study which examined the same pool of 16,000 women as the July 9, 2002, WHI study, found that hormone therapy drugs do not do the very thing many women took them for in the first place — that is, to make them feel happier and healthier after menopause.  A comparison of women who took hormone therapy to women given a placebo showed those women taking hormones did not report sleeping better or feeling better.  The hormone therapy group also did not report less depression or more sexual satisfaction than the placebo group.

82.    According to the study's lead author, Dr. Jennifer Hays:  "It's just not something that's going to make most women feel better.  Even if it reduces your symptoms, that's not going to translate into a meaningful effect on a quality of life."  Dr. Deborah Grady of the University of California, San Francisco, in an accompanying commentary in the same issue of the NEJM said that:  "There is no role for hormone therapy in the treatment of women without menopausal symptoms" and that only women who were experiencing debilitating menopausal symptoms should take hormone therapy.  She stated that those women who do continue with hormone therapy should take the lowest possible dose for the shortest possible time.

83.    On May 21, 2003, JAMA published another study studying the efficacy of estrogen plus progestin therapy (e.g., Prempro) for prevention of bone loss in elderly women.  The study involved 373 women ages 65 to 90 who had either thinning bones or full-blown osteoporosis and took one of four treatments for three years:  (i) combination hormone therapy alone, (ii) a bone-building drug, alendronate (which is sold under the brand name, Fosamax), (iii) combination hormone therapy with Fosamax, or (iv) a placebo.

84.    While the study found that the combination of hormone therapy and Fosamax was effective at treatment and prevention of post-menopausal osteoporosis, it also concluded that

Fosamax alone was more effective than combination hormone therapy alone. After three years, hip bone density had increased nearly six percent in women on hormone therapy with Fosamax, four percent in those on Fosamax alone, and three percent in the hormones-only group.

85.    Dr. Jennifer Hays, a WHI researcher and lead author of the May 8, 2003, JAMA study on hormone therapy and quality of life, said that the findings of the bone-loss study are not convincing enough to recommend hormone therapy for osteoporosis prevention even in older women, especially because the study showed that the bone-enhancing benefit from estrogen come only after long-term use which also carries the highest risk of breast cancer or heart disease.

86.    On May 28, 2003, JAMA published yet another study on the effects of hormone therapy, this time focusing on the risk of Alzheimer's disease and other types of dementia. The study found that combination hormone therapy, consisting of both estrogen and progestin, doubled the risk of dementia for woman who started hormones at age 65 or older.

87.    The dementia study was based on a four-year experiment involving 4,532 women at 39 medical centers, where half took placebos and half took Prempro. In four years, there were 40 cases of dementia in the Prempro group and 21 in the placebo group. Translated to an annual rate for the population-at-large, the results mean that for every 10,000 women 65 and older taking hormone therapy, there will be 45 cases of dementia a year with 23 of them attributable to hormone use.

88.    Dr. Sally A. Shumaker, the director of the dementia study and a professor of public health sciences at Wake Forest University, stated that the study's "clear message is that there's no reason for older women to be taking combination hormone therapy."

89.    On June 25, 2003, JAMA published still another study analyzing the data from the Women's Health Initiative, which found that in addition to stimulating the growth of breast cancer, combination hormone therapy makes breast tumors harder to detect, leading to dangerous delays in diagnosis.  The report found that breast abnormalities could develop soon after a woman starts taking hormone therapy.  Consequently, the study's findings raise questions about the safety of even short-term hormone use.  In the same June 25, 2003, issue that reported this study, JAMA also published an editorial by Dr. Peter H. Gann, a cancer epidemiologist at Northwestern University, who stated that this study represents "further compelling evidence against the use of combination estrogen plus progestin hormone therapy."

90.    The connection between hormone therapy usage and breast cancer found in the WHI studies were confirmed by a similar study conducted in the United Kingdom.  The August 9, 2003, issue of *Lancet* reported on the conclusions reached by *The Million Women Study* — a major research effort funded by Cancer Research UK — confirming that current and recent use of hormone therapy increases a woman's chance of developing breast cancer, and that the risk increases with duration of use.  Scientists at the Cancer Research UK analyzed data from over one million women between the ages of 50 and 64.  Researchers found that post-menopausal women using combination hormone therapy were twice as likely to develop breast cancer as non-users (a 100 per cent increase).

91.    In the August 7, 2003, issue of *NEJM*, the WHI study continued to yield important information regarding the safety of hormone therapy use.  The study found that combination hormone therapy does not protect the heart and may even increase the risk of coronary heart disease (CHD).  Specifically, the WHI study found that combination hormone therapy usage was associated with a 24 percent overall increase in the risk of CHD (six more

heart attacks annually per 10,000 women using combination therapy) and a 81% increased risk of CHD in the first year after starting combination therapy.

92.    In addition to the studies published in *JAMA, NEJM,* and other medical journals, a recent federal agency report also revealed that estrogen could be dangerous to women taking it as hormone therapy.   On December 11, 2002, the National Institute of Environmental Health Sciences released their tenth annual report on carcinogens, which declared for the first time that estrogen is now on the federal government's list of "known human carcinogens."

## F.  Defendant Changes Hormone Labels and Reverses Long-Term Marketing Strategy

93.    The warnings and labels provided by the Defendant were inadequate, misleading, and inaccurate.  The Defendant minimized the risks of these drugs to prescribing physicians and ultimate users while simultaneously exaggerating the purported benefit.  As a result, physicians and patients had no ability to conduct a realistic and well-informed risk versus benefit assessment.

94.    In light of the WHI and NCI studies and other subsequent research reports, the labels provided by Wyeth for their Premarin and Prempro drugs were inadequate, misleading, and inaccurate.  In fact, Wyeth changed warning labels on Premarin and Prempro during the last week of August 2002 to reflect the results of the July 2002 WHI and NCI studies, but even these labels failed to fully and adequately convey the risks of these drugs.

95.    The Prempro label warnings were likewise inadequate prior to August 2002.  As to breast cancer, the Prempro warning explains the risk of breast cancer with conjugated estrogens (the Premarin component of Prempro), but then adds, with regard to the effect of added progestins on the risk of breast cancer:  "The overall incidence of breast cancer does not exceed

that expected in the general population."  The WHI study plainly reveals that this warning is false and was known or should have been known by Wyeth to be false for decades.

96.    The Prempro warnings were also inadequate for two thromboembolic disorders, pulmonary embolisms and blood clots:  "The increased risk [of venous thromboembolism] was found only in current ERT [i.e., Premarin only] users."  Furthermore, as to cardiovascular disease (heart attacks and strokes), the Prempro warning reads simply "Embolic cerebrovascular events and myocardial infarctions have been reported," without disclosing the true nature of the risk.

97.    Under precautions, the Prempro label acknowledges:  "The effects of estrogen replacement therapy on the risk of cardiovascular disease have not been adequately studied." Nevertheless, Wyeth has long promoted the supposed benefit of long term hormone therapy for cardiovascular disease.

98.    The Defendant provided inadequate warnings concerning hormone therapy as to breast cancer.  For instance, the Prempro warning mentioned the risk of breast cancer with conjugated estrogens (the Premarin component of Prempro) but emphasized that, with the addition of progestin, "the overall incidence of breast cancer does not exceed that expected in the general population."  Dozens of other studies plainly reveal that this warning is false, and Defendant Wyeth knew or should have known it to be false for decades.  Sales representatives or detailers for the Defendant falsely represented there was no cancer risk or a minimal risk associated with synthetic hormone therapy drugs.

99.    The Defendants provided inadequate warnings regarding the relationship between oral estrogen and synthetic progestin hormone therapy and blood clots. For example, the Prempro warnings expressly minimized the risks of thromboembolic disorders, pulmonary

embolisms and venous blood clots with language such as "the increased risk [of venous thromboembolism] was found only in current ERT [i.e., Premarin only] users," "postmenopausal estrogen use does not increase the risk of stroke" and "embolic cerebrovascular events and myocardial infarctions have been reported," without disclosing the true nature of the risks. Furthermore, the Defendant failed to warn that oral estrogen substantially increases the risk of dangerous, life-threatening blood clots compared to transdermal human identical estradiol.

100.    The Defendants provided inadequate warnings concerning hormone therapy and their link to cardiac damage. For example, under "Precautions," Defendant Wyeth's Prempro label acknowledged: "The effects of estrogen replacement therapy on the risk of cardiovascular disease have not been adequately studied." Nevertheless, Defendant Wyeth consistently and deceptively promoted the benefit of long-term hormone therapy for cardiovascular disease. This promotion was "off-label," was not supported or permitted by the Food & Drug Administration and was used by Wyeth to increase sales of their animal and synthetic hormone therapy drugs.

101.    The Defendant Wyeth represented that hormone therapy was safe at the dosages recommended over the years even though Defendant knew lower doses of these medications are just as effective and less risky. It was not until 2003 that the Defendant cautioned physicians to prescribe the lowest possible dose. Indeed, Wyeth built a new marketing strategy around the slogan, "Go low with Prempro," and launched a new, lower dose combination treatment.

102.    The Defendant represented that hormone therapy had benefit without support from reliable science. It failed to conduct the necessary pre-approval research and post-approval surveillance to establish the safety of a long-term hormone therapy regimen. The Defendant abdicated their responsibility to perform and support adequate safety studies to investigate the

serious known and suspected risks of long-term hormone therapy use. The Defendant never told physicians or the public that it had not conducted any cancer studies on these drugs compared to alternative therapies, thereby deceptively inducing physicians to prescribe these products and patients to use them, with the false assumption that such drugs had been sufficiently tested.

103.    The manufacturers of generic MPA pills (including, but not limited to Wyeth for Cycrin) as well as brand-name Pfizer's Provera were aware that MPA would be prescribed as a part of combination hormone therapy. Indeed, the Defendants marketed, promoted and sold their MPA for combination use. The Defendants knew, or in the exercise of reasonable care should have known, that the synthetic progestins such as Provera / MPA were harmful, were defective in design, would exaggerate or accelerate the harmful effects of estrogen and would be unreasonably dangerous if used with estrogen as combination therapy. The Defendants also knew or should have known that oral micronized human identical progesterone is equally effective in protecting the uterus and, unlike MPA, does not significantly increase the risk of breast cancer and does not offset any beneficial effects of estrogen. Provera / MPA, when used in combination hormone therapy, has deleterious effects, including, but not limited to increasing the incidence of strokes, blood clots, heart attacks, and breast cancer. Even though the Defendants knew of these risks, they did not warn consumers of the serious adverse side effects of Provera / MPA in combination hormone therapy in any of their labels or promotional materials.

104.    The Defendants never disclosed to physicians and patients that they had not conducted post-market safety studies and investigations of safer alternatives, thereby inducing physicians to prescribe and patients to ingest Provera / MPA drugs with the false belief that these

drugs had been adequately and fully tested and that the risk questions about these drugs' effect on the heart and breast were answered.

G.    **Safer Alternatives**

105.    Beginning in the late 1980s, Defendant Wyeth also attempted to develop a human bio-identical hormone therapy regimen containing estradiol and oral progesterone.

106.    In the early 1990s, Wyeth actively negotiated with the drug maker Schering to obtain the rights to market the human progesterone Prometrium, which had been approved for use in France and other countries since 1980.  Prometrium is as effective as MPA but lacks the carcinogenic and cardiovascular side effects of MPA.  However, Defendant Wyeth abandoned these negotiations and decided instead to develop their own combination human identical hormone therapy product.

107.    Defendant Wyeth scrapped this plan when their engineers were unable to make an effective time-release oral delivery version of the drug to compete with Prometrium. Meanwhile, Wyeth had lost their chance to acquire the North American rights to Prometrium, whose oral micronized delivery system worked well.  Unable to develop their own patented form of Prometrium, Wyeth chose to continue promoting Premarin with the synthetic progestin MPA rather than the much safer human identical progesterone.

108.    Had Defendant Wyeth done follow-up epidemiological studies, at least by the late 1980's or early 1990s, it would have had a much clearer understanding that the combination of estrogen and MPA caused a significantly higher risk of breast cancer than estrogen alone, and would have done the research necessary to establish safer alternatives, and substituted those alternatives for MPA.

109.    Knowing that MPA is unreasonably dangerous, Defendant Wyeth has developed, and continues to develop, prescription drugs to treat symptoms of menopause that do not contain MPA or any other synthetic progestin.  Women who use synthetic progestins other than MPA do not develop hormone therapy induced breast cancers.  Those who use combination hormone therapy that include MPA are at a substantially increased risk of developing breast cancers.

## IV.  FRAUDULENT CONCEALMENT

110.    Any applicable statutes of limitations have been tolled by the knowing and active concealment and denial of the facts as alleged herein by Defendants.  Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on her part.  Plaintiff could not reasonably have discovered the dangerous nature of and unreasonable adverse side effects associated with her use of hormone replacement combo therapy prior to when she was damaged by these drugs.

111.    Defendants are and were under a continuing duty to disclose the true character, quality, and nature of their hormone therapy drugs to the Plaintiff.  Because of their concealment of the true character, quality and nature of their hormone therapy drugs, Defendants are estopped from relying on any statute of limitations defense.

## V.  CAUSES OF ACTION

## COUNT I — NEGLIGENCE

112.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

113.    At all relevant times, Defendants had and continue to have a duty to exercise reasonable care, and to comply with the then existing standard of care, to properly prepare, design, research, develop, manufacture, inspect, label, market, promote, and sell their hormone

therapy drugs, including Wyeth's Premarin, Prempro, Premphase and medroxyprogesterone acetate, which they introduced into the stream of commerce, including a duty to insure their hormone therapy drugs did not cause users to suffer from unreasonable, dangerous or untoward adverse side effects.

114.    At all times relevant, Defendants owed a duty to warn consumers of the risks, dangers, and adverse side effects of their hormone therapy drugs.

115.    Defendants breached their duty by failing to exercise ordinary care, and to comply with the standard of care, in preparing, designing, researching, developing, manufacturing, inspection, labeling, marketing, promoting and selling their hormone therapy drugs, including Wyeth's Premarin, Prempro, Premphase and medroxyprogesterone acetate, which they introduced into the stream of commerce, because Defendants knew or should have known that their hormone therapy drugs created the risk of unreasonable, dangerous or untoward adverse side effects.

116.    Defendants knew, or in the exercise of reasonable care, should have known that their hormone therapy drugs, including Wyeth's Premarin, Prempro, Premphase and medroxyprogesterone acetate, were of such a nature that, if not properly prepared, designed, researched, developed, manufactured, inspected, labeled, marketed, promoted, and sold, would likely cause injury to those who took their drugs.

117.    Defendants negligently prepared, designed, researched, developed, manufactured, inspected, labeled, marketed, promoted and sold their hormone therapy drugs, including Wyeth's Premarin, Prempro, Premphase and medroxyprogesterone acetate, in that they:

(i)     Failed to use due care in the preparation of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(ii)    Failed to use due care in the design of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(iii)   Failed to conduct adequate pre-clinical testing and research to determine the safety of their hormone therapy drugs;

(iv)    Failed to conduct adequate post-marketing surveillance to determine the safety of their hormone therapy drugs;

(v)     Failed to accompany their products with proper warnings regarding all possible adverse side effects associated with the use of their hormone therapy drugs and the comparative severity and duration of such adverse effects;

(vi)    Failed to use due care in the development of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(vii)   Failed to use due care in the manufacture of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(viii)  Failed to use due care in the inspection of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(ix)    Failed to use due care in the labeling of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(x)    Failed to use due care in the marketing of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(xi)    Failed to use due care in the promotion of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(xii)    Failed to use due care in the selling of their hormone therapy drugs to prevent the aforementioned risks to individuals when the drugs were ingested;

(xiii)    Failed to provide adequate training and information to healthcare providers for the appropriate use of their hormone therapy drugs;

(xiv)    Failed to warn Plaintiff and her healthcare providers, prior to actively encouraging and promoting the sale of their hormone therapy drugs, either directly or indirectly, orally or in writing, about the following:

- the need for comprehensive, regular medical monitoring to insure early discovery of potentially fatal strokes, heart attacks, venous thromboembolism, cardiovascular disease, breast cancer, ovarian cancer, and other adverse side effects;

- the possibility of becoming disabled as a result of the use of the drugs;

- the adverse side effects associated with the use of the drugs, including, but not limited to, strokes, heart attacks, venous thromboembolism, cardiovascular disease, breast cancer, and ovarian cancer;

(xv)   Was otherwise careless and negligent; and

(xvi)  Failed to comply with legal and regulatory obligations under the Federal Food, Drug and Cosmetic Act and applicable regulations.

118.   Despite the fact that Defendants knew or should have known that their hormone therapy drugs caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Defendants continued to promote and market their drugs to consumers, including Plaintiff, when safer menopausal hormone therapy products were available; and, more effective methods of countering the negative health effects of menopause, the prevention of osteoporosis and other diseases, claimed by Defendant Wyeth to be prevented by their hormone therapy.

119.   Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of their failure to exercise ordinary care as described herein.

120.   Defendants' failure to warn was reckless and without regard for the public's safety and welfare, and in particular, the Plaintiff.  Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety of their products.  Defendants downplayed, understated, and disregarded their knowledge of the serious and permanent side effects associated with the use of hormone therapy drugs

despite available information demonstrating that their products were likely to cause serious and sometimes fatal side effects to users.

121.    Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects.  Nevertheless, Defendants continued to market their products by providing false and misleading information with regard to their safety and efficacy.

122.    Defendants' actions, described above, were performed willfully, intentionally and with reckless disregard for the rights of Plaintiff and the public.

123.    As a direct and proximate result of the Defendants' breach of their duties of due care, and a breach of the standard of care, Plaintiff suffered those injuries and damages specified herein.

124.    Had the Defendants complied with their obligation of due care, and the then existing standard of care, Plaintiff would not have developed breast cancer, and would not have suffered the sequelae of breast cancer.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, as well as all costs of this action and a trial by jury of all issues to be tried. The conduct, actions and inaction by Defendant as described herein were intentional, fraudulent, reckless and malicious for which punitive damages are sought and should be awarded to deter the same or similar conduct in the future.

## COUNT II
## STRICT LIABILITY
## DEFECTIVE DESIGN

125.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

126.    At all times material hereto, Defendant have engaged in the business of selling, distributing, supplying, designing, manufacturing, marketing and promoting the aforementioned hormone replacement drugs that are defective and unreasonably dangerous to consumers, including Plaintiff.

127.    At all times material hereto, said drugs were sold, distributed, supplied, designed, manufactured and/or promoted by Defendant and was expected to reach, and did reach, prescribing physicians and consumers, including Plaintiff, without substantial change in the condition in which it was sold.

128.    Premphase and Prempro are defective products in the sense that it is not reasonably safe for its intended use, based on an objective analysis weighing its risks and benefits against those of alternative drugs and therapies.

129.    At all times material hereto, the which aforementioned defective products were sold, distributed, supplied, designed, manufactured and/or promoted by the Defendants were in a defective and unreasonably dangerous condition at the time such drug products were manufactured, packaged, assembled, labeled, distributed, supplied, and placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

       1.    When manufactured, packaged, assembled, labeled, distributed, supplied, and placed in the stream of commerce, Defendants' drug products ingested by the Plaintiff contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff to risks which exceeded the benefits of the drugs;

       2.    When manufactured, packaged, assembled, labeled, distributed, supplied, and placed in the stream of commerce, Defendants' drug products were defective in design and formulation, making use of such drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with menopause;

3.      Defendants' drug products were insufficiently tested;

4.      Defendants' drug products were marketed to be used in a combination which was known to Defendant to cause harmful side effects which outweighed any potential utility; and

5.      Alone or in combination, Defendants' drug products were not safe for their intended use as treatment for post-menopausal symptoms.

130.    There was a serious risk of harm to the public that resulted from the defect in Defendants' drug products. Defendants were aware of the existence and seriousness of the defects prior to the injury of Plaintiff. Defendant did not correct the defects, or take other steps to reduce the danger of injury. The amount it would have cost to correct the defect, or reduce the danger, was small compared to the risk the defect posed to consumers and users of Defendants' drug products. The amount of profits that Defendant received from other sales of the defective drug was in the millions of dollars. Defendant attempted to conceal the defect or deceive the public about the safety of their drug products; and, Defendants have very significant financial resources.

131.    But for the aforementioned defective and unreasonably dangerous conditions, Defendants' drug products would not have been prescribed to Plaintiff, Plaintiff would not have ingested such products, and Plaintiff would not have suffered the personal injuries as alleged herein.

132.    As a direct and proximate result of the defective condition of Defendants' drug products, Plaintiff sustained serious and permanent injuries, breast cancer, physical pain and suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of earnings and loss of the ability to earn money in the past and the future, expense of hospitalization, medical and nursing care and treatment, and any other relief to which the Court finds Plaintiff entitled.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, as well as all costs of this action and a trial by jury of all issues to be tried. The conduct, actions and inaction by Defendant as described herein were intentional, fraudulent, reckless and malicious for which punitive damages are sought and should be awarded to deter the same or similar conduct in the future.

### COUNT III
### STRICT LIABILITY
### FAILURE TO ADEQUATELY WARN

133.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

134.    Defendants' drug products were defective and unreasonably dangerous when manufactured, packaged, assembled, labeled, marketed, distributed, supplied, placed in the stream of commerce and when such products left the possession of Defendant in that they contained warnings which were misleading regarding the purported benefits associated with Defendants' drug products and which were inadequate and insufficient to alert physicians and consumers, such as Plaintiff, to the dangerous risks and reactions associated with Defendants' drug products, including, but not limited to, breast cancer, heart attack, stroke, and death. Plaintiff did suffer breast cancer and other injuries as a result her ingestion of Defendants' drug products.

135.    Physicians prescribed Defendants' drug products to Plaintiff for its intended purpose.

136.    The prescribing physicians could not have discovered any defect in Defendants' drug products through the exercise of reasonable care.

137.    Defendant, as manufacturers of prescription medications, is held to the level of

knowledge of an expert in the field.

138.    The prescribing physicians did not have substantially the same knowledge as an adequate warning from the manufacturer or distributor should have communicated to the prescribing physician.

139.    The warnings that were given by Defendant to the prescribing physicians were not adequate, accurate, clear, and were ambiguous.

140.    Defendants actively sought to "bury" the limited warnings they did provide to prescribing physicians, including Plaintiff herein, in the fine print of the labeling, and knowingly and intentionally failed to display those warnings prominently in order to hide from prescribing physicians and the consuming public the true risks of severe and life threatening complications which had been reported in association with Defendants' drug products, including but not limited to breast cancer, heart attack, stroke, and death.

141.    Defendants had a continuing duty to warn the prescribing physicians of the dangers associated with the use of Defendants' hormone replacement drugs.

142.    Defendant's Defendants' drug products marketing, including promotions directed toward health care professionals, was a sustained campaign that spanned many years, characterized by misrepresentations by commission and omission as to the risks and benefits, particularly as to substantial increased risk of, among others, breast cancer, heart attack, stroke, and death.  Plaintiff did suffer serious injury, including breast cancer and other injuries as a direct result of Defendants' failure to adequately warn of the risks associated with their drug products.

143.    The public, including Plaintiff, and prescribing physicians, including Plaintiff's prescribing physicians, reasonably relied upon Defendant's misrepresentations as to the risks and

benefits of Defendants' drug products in deciding to take it and prescribe it.

144.    As a direct and proximate result of the defective condition of Defendants' drug products, Plaintiff sustained serious and permanent injuries, breast cancer, physical pain and suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, loss of earnings and loss of the ability to earn money in the past and the future, expense of hospitalization, medical and nursing care and treatment, and any other relief to which the Court finds Plaintiff entitled.

WHEREFORE, Plaintiff demands judgment against Defendant for damages, as well as all costs of this action and a trial by jury of all issues to be tried. The conduct, actions and inaction by Defendant as described herein were intentional, fraudulent, reckless and malicious for which punitive damages are sought and should be awarded to deter the same or similar conduct in the future.

## COUNT IV — FRAUD

145.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

146.    Defendants, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote, and sell hormone therapy drugs, including Wyeth's Premarin, Prempro, Premphase, and medroxyprogesterone acetate, Defendants owed a duty to provide accurate and complete information regarding their products.

147.    Defendants' advertising program, by containing affirmative misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of their hormone therapy drugs, including Wyeth's Premarin, Prempro, Premphase, and

Medroxyprogesterone acetate, were safe for human use, had no unacceptable side effects, and would not interfere with daily life.

148.    Defendants intentionally encouraged women and Plaintiff in particular to remain on hormone therapy for a longer period of time than Defendants knew or should have known was safe and effective.

149.    On information and belief, Plaintiff avers that Defendants purposefully concealed, failed to disclose, misstated, downplayed, and understated the health hazards and risks associated with the use of hormone therapy.  Defendants, through promotional literature, deceived potential users and prescribers of their drugs by relaying only allegedly positive information, while concealing, misstating, and downplaying known adverse and serious health effects with the intention that the recipient of the information would rely on the information contained therein. Defendants falsely and deceptively kept relevant information from potential hormone therapy users and minimized prescriber concerns regarding the safety and efficacy of their drugs.

150.    Plaintiff justifiably relied to her detriment upon Defendants' intentional misrepresentations concerning their hormone therapy drugs.

151.    In particular, in the materials disseminated by Defendants, they falsely and deceptively misrepresented or omitted a number of material facts regarding their hormone replacement drugs, including Wyeth's Premarin, Prempro, Premphase, and Medroxyprogesterone acetate and Pfizer's Provera, including, but not limited to, the following:

> (i)    The presence and adequacy of the testing of their hormone therapy drugs, both pre-and post-marketing; and,
>
> (ii)    The severity and frequency of adverse health effects caused by their hormone therapy drugs.

152.    These materials and affirmations came in the form of:  (i) publicly-made written and verbal assurances of the safety and efficacy of hormone therapy drugs by Defendants, (ii) press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create and increase demand for hormone therapy drugs, which utterly failed to warn of the risks inherent to the ingestion of hormone therapy;  (iii) verbal assurances made by Defendants regarding hormone therapy, and the downplaying of any risk associated with the drugs;  (iv) false and misleading written information, supplied by Defendants, and published in the *Physicians Desk Reference* on an annual basis, upon which physicians were forced to rely in prescribing hormone therapy drugs during the period of Plaintiff's ingestion of hormone therapy drugs, including, but not limited to information relating the recommended duration of the use of the drugs; (v) promotional pamphlets and brochures published and distributed by Defendants and directed to consumers; and,  (vi) advertisements.  The documents referred to in this paragraph were created by and at the direction of Defendants and, therefore, are in their possession and control.

153.    The failure of the Defendants to warn was reckless and without regard for the public's safety and welfare and that of the Plaintiff.  Defendants misled both the medical community and the public at large, including Plaintiff, by making false representations about the safety of their hormone therapy drugs.

154.    Defendants were or should have been in possession of evidence demonstrating that their products caused serious side effects.  Nevertheless, Defendants continued to market their products by providing false and misleading information with regard to their safety and efficacy.

155.    Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiff and the public.

156.    As a result of Defendants' conduct, Plaintiff suffered the injuries and damages specified herein and is entitled to damages, including punitive damages, in an amount to be determined at trial.

## COUNT V — JOINT VENTURES, PARENT/SUBSIDIARIES, AND/OR SUCCESSOR CORPORATION

157.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein at length, and further alleges:

158.    As a result of their participation in various joint ventures, parent/subsidiary relationships, and/or successor corporations, Defendants are liable to Plaintiff.

159.    As a result of their negligent supervision and actual supervision of various joint ventures, parent/subsidiary relationships, and/or successor corporations, Defendants are liable to Plaintiff.

160.    As a result of the invalidity of various indemnification agreements, Defendants are liable to Plaintiff.

161.    Defendants are liable to Plaintiff, as alter egos of their joint ventures, parent/subsidiary relationships, and/or successor corporations.

162.    As a result of Defendants' conduct, Plaintiff suffered the injuries and damages specified herein and is entitled to damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff, Julie Beck demands judgment against Defendants, Wyeth, Inc. and Wyeth Pharmaceuticals Inc. as follows:

(i)     Compensatory damages in an amount in excess of $75,000.00 as provided

        by law and to be supported by the evidence at trial;

(ii)    An award of attorney's fees, pre-judgment and post-judgment interest, and

        the costs of suit, as provided by law;

(iii)   Punitive damages;

(iv)    Such other legal and equitable relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable in this action.


Respectfully submitted this 27th day of June 2008.



                                        /s/ *Daniel J. Thornburg*
                                        Daniel J. Thornburg (Attorney ID: 0388712)
                                        **Aylstock, Witkin, Kreis & Overholtz, PLLC**
                                        803 North Palafox Street
                                        Pensacola, FL 32501
                                        (850) 916-7450 Phone
                                        (850) 850-7449 Facsimile
                                        dthornburg@awkolaw.com
                                        ***Attorneys for Plaintiff***
                                        ***Julie Beck***


***Of Counsel:***

Rainey Booth, Esq.
Zoe Littlepage Esq.
*Littlepage Booth*
327 E. Romana Street
Pensacola, FL 32502